E-FILED
Monday, 05 December, 2005  03:21:41 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| THE SPRINGFIELD BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al, ) ) ) ) Plaintiffs, ) v. ) CITY OF SPRINGFIELD, ILLINOIS, et al ) ) Defendant, and ) ) POLICE BENEVOLENT AND PROTECTIVE ASSOCIATION, UNIT NO. 5 and INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 37, ) ) ) ) ) Third-Party Defendants. ) | CASE NO. 00-3136 |

## MEMORANDUM OF PLAINTIFFS JOHNSON AND HOLDER IN SUPPORT OF AMENDED MOTION OF PLAINTIFFS JAMES E. JOHNSON AND TARA HOLDER TO ENFORCE CONSENT DECREE AND FOR RULE TO SHOW CAUSE

### BACKGROUND

On September 5, 2001, this Court entered a Consent Decree at the request of the Defendant, City of Springfield, and the Plaintiffs, NAACP, Johnson, Holder and six other persons. That Consent Decree imposed certain requirements on the City of Springfield. During the more than four years that have passed since the entry of the Consent Decree, the City has failed, in several ways, to abide by the order of this Court and to fulfill its agreement as embodied in the Consent Decree.

This Court has the authority to hear and address the concerns raised by this Motion. Paragraph 25 of the Consent Decree provides that "the Court shall

1

retain jurisdiction over this action to enforce this Consent Decree, and to hear and resolve any motions to enforce or modify the Decree or seeking supplemental relief, to the extent such motions are otherwise permitted herein".

Enforcement of the terms of this Consent Decree is important not only to the Plaintiffs, but also to the Court itself. Consent decrees are neither wholly contract, nor wholly judicial decree; indeed they have been described as both. *Local Number 93, International Assoc. of Firefighters v. Cleveland*, 478 U.S. 501, 519 (1986). A consent decree is contractual in nature because it reflects the agreement of the parties. Yet it also has the attributes of a judicial order because it is entered by a Court, is enforceable by citation for contempt of court and may be modified in certain circumstances even over the objections of the party. *United States of America v. Moore American Graphics, Inc.*, No.84C6547(No.Dist.of Ill. 1989).

One who is subject to a Court order has the obligation to obey it honestly and fairly, and to take all necessary steps to render it effective. *Federal Marketing Company, v. Virginia Impression Products Company, Inc.,* 823 A.2d 513, 528 (D.C. 2003). The City has failed to fulfill this obligation during the more than four years the Consent Decree has been in effect. City Alderman Frank McNeil recently testified, "Well, my way of looking at it is they are not complying with the consent decree, with the Order, and we should comply with the Order". [Ex.8, p.29]

Generally, there are three main areas of concern with respect to the City's continued non-compliance with the Consent Decree.

**1**

**The City failed to file reports in a timely manner as required by paragraph 21 of the Consent Decree after being reminded to do so.**

Paragraph 21 of the Consent Decree provides in relevant part that:

> On February 1st and August 1st of each year in which this Decree is in effect, Springfield shall provide to counsel for the Plaintiffs a report showing for the six month periods ending December 31st and June 30th, the following…"

There follows in sections 21(a)-(e) of the Consent Decree a specification of the information the City was required to provide in these six month reports. There is no dispute that the City failed to file all of these reports in a timely manner, as ordered by the Court

Corporation Counsel Jenifer Johnson admitted in her letter to Attorney Rose dated May 12, 2005 [responding to Rose's letter of April 1, 2005] that the City had failed to file three reports [two which were due in 2004 and one which was due in February 2005]. Johnson claimed in her letter that these failures to abide by the Court's Decree were an "oversight".

The testimony of former Chief of Staff, Letitita Dewith-Anderson, indicates if this failure was an "oversight", it is an "oversight" born of the City's failure to take the Consent Decree seriously.

Dewith-Anderson was Chief of Staff to Mayor Davlin from April 17, 2003 (when he assumed office) through January 11, 2004, although her duties and title were diminished during that time period. Dewith-Anderson, who is African-American, was concerned about compliance with the Consent Decree so she prepared a summary of the Consent Decree for Mayor Davlin but does not

believe that he read it. [Ex.1, p.57] She discussed the need to file semi-annual reports under the Consent Decree with the Mayor. [Ex.1, p.57] She testified, "We were not adhering to the Consent Decree" [Ex.1, p.57] and that the City was out of compliance with the Decree because reports were not being made. [Ex.1, p.57] She also testified, "There were a lot of things in that Consent Decree that we were not in compliance with". [Ex.1, p.58]

In spite of Dewith-Anderson's reminder to Mayor Davlin and Corporation Counsel Jenifer Johnson in 2003, the two reports for 2004 and the report due February 1, 2005 were not filed until mid-2005, after the NAACP complained to the City about compliance. Dewith-Anderson testified that the City "did not take this seriously". [Ex.1, p.59]

The City claims that its failure to file the required reports during the year and half period after being reminded that they had to do so, should be forgiven because they finally filed the reports all at one time. On page 11 of its previous Response filed herein [Ct. Doc.97], the City attempted to brush away its admitted failure to comply with the reporting requirements of paragraph 21 the Consent Decree by stating "The allegation that the City has failed to provide several reports required by paragraph 21 of the Consent Decree in a timely manner may be true in certain instances but nonetheless the City has provided these reports to the NAACP". It should be remembered that this mass filing occurred only after the Plaintiffs complained about the City's non-compliance.

This attitude toward its obligations under the Consent Decree is consistent with Dewith-Anderson's testimony that this City administration does not take

racial issues, including those in the police and fire department, seriously. This testimony also demonstrates that the City does not take this Court's order seriously.

In his recent deposition, Mayor Davlin first testified, under oath, that the Consent Decree reports had been filed by the City in a timely manner. [Ex.2, pp.48,49] Then, after being shown Johnson's letter in which she stated that some of the reports were not filed, Mayor Davlin admitted that some of the reports were not timely. [Ex.2, pp.48,49] He also testified that although as Mayor it is his responsibility to make sure that the City is complying with the Order of this Court, he did not know that the reports were not being filed as ordered. [Ex.2, pp.50,51] This further demonstrates that this City administration does not take the Court's order seriously.

The timely filing of these six month reports was critical to the success of the purposes of the Consent Decree since these reports are designed to allow for the tracking of the City's progress. Failing to follow the Court's order to file them in a timely manner defeats that purpose. The City's actions, and inaction, with respect to its obligations under the Consent Decree will likely continue unless the Court compels compliance.

**2**

**The City has failed to take the necessary steps to hire black firefighters and police officers in adequate numbers as required by paragraphs 10 and 11 of the Consent Decree.**

The number of African-American police officers employed by the Springfield Police Department is now less than it was at the time the Consent

Decree was entered in 2001. This is due, in part, to the City's failure to implement and maintain an effective recruitment program as required by the Consent Decree [Pars. 10 and 11] and to take appropriate action to discipline employees who are responsible for racially discriminatory practices. The City has also violated the Consent Decree by failing to significantly increase the number of African-American firefighters during the four years the Consent Decree has been in effect. City Alderman Frank McNeil recently testified that the City has not taken the steps necessary to achieve the goals in the Consent Decree. [Ex.8, pp.37-39]

Mayor Davlin has publicly admitted that the City has failed in its efforts to recruit minorities. Attached as Ex. 3 is a copy of a newspaper article published August 12, 2005 in which Mayor Davlin is quoted as stating, "I want to readily admit that our efforts that started in 1979 have failed. I don't care who it is, I want someone to come in and solve our problem." That article was published one day after the resignation of a black police recruit (Plaintiff Tara Holder). Another black recruit has resigned since that article was published (Police Recruit Glenn Austin).

Mayor Davlin also admitted in his recent deposition that the City's efforts in recruiting minorities to the police and fire department have been a "total failure" for the past 26 years. [Ex.2, pp.42,43] He also admitted that the City's recruitment committee that he implemented and maintained for the past two years has not worked. [Ex.2, p.54] There are specific reasons for this which are attributable to Mayor Davlin and the City.

**1. The City has failed at recruitment because it failed to follow a recruitment plan.**

When Dewith-Anderson worked for Mayor Davlin in 2003, she organized a minority recruitment committee to deal with recruitment of minorities in the police and fire departments in an effort to comply with the Consent Decree. [Ex.1, p.38] The Mayor did not ask her to do this, she created this committee on her own. [Ex.1, p.65] She also put together a recruiting plan for Mayor Davlin showing what steps he needed to take under the Consent Decree. Mayor Davlin did not follow this recruiting plan. [Ex.1, p.40]

**2. The City has failed at recruitment because it failed to adequately fund recruitment.**

The City has failed to adequately fund recruitment. At that time there was no funding for recruitment in the fire department. [Ex.1, pp.38,39] There was some money in the police budget for recruiting, but it was too small for effective recruiting. [Ex.1, p.39] Dewith-Anderson asked the Mayor for an increase in the police recruiting budget, but he did not increase amount budgeted for recruiting. [Ex.1, p.39] The fire department recruiting budget went from "zero to something", but it was still not enough for effective recruiting. [Ex.1, p.39]

**3. The City has failed at recruitment because it failed to properly utilize minorities for recruitment.**

She also suggested having minorities do the recruiting rather than all white employees, but that suggestion was not followed by the Mayor or the City. She admitted that the efforts of the recruitment committee were not successful. [Ex.1, p.67] She testified that the administration did not take recruiting seriously

because when they put forward a recruiting program to Mayor Davlin, nothing happened. [Ex.1, p.67]

Mayor Davlin recently removed former police Sergeant Ralph Harris and Lt. Rickey Davis, both African-American, from Minority Recruitment Committee, despite the fact that they were the only members to bring written suggestions for the improvement of recruiting efforts to the table. [Ex.7] Those suggestions were rejected by the City.

**4. The City has failed at recruitment because the administration does not take the issue of minority recruitment seriously.**

Mayor Davlin admitted in a recent deposition that he does not even know whether the numbers of minorities in the police and fire departments have increased or decreased since the entry of the Consent Decree. [Ex.2, p.46] He also admitted that he does not know the current number of African-American officers in the Police Department or the number at the time the Consent Decree was entered. [Ex.2, p.47] He also admitted that he brought no suggestions to the Recruitment Committee himself. [Ex.2, p.123]

The City now attempts to blame the NAACP and Plaintiff Johnson for this failure, but the obligation to implement and maintain the recruitment program and to increase the numbers of minorities is the responsibility of the City, both by its agreement and by order of this Court. Attempting to shift the blame for this failure to others is further indication that the City does not take its responsibilities under the Decree seriously.

Thus, while the City agreed in 2001 to increase numbers of minorities in the police department and to implement and maintain a recruitment program aimed at increasing these numbers, the City has failed to do so, again because it has failed to take the Decree seriously. For example, recently, eleven new police recruits were hired. All are Caucasian, although there were eleven African-American recruits on the hiring list that were qualified. [Ex.8, p.22]

**5. The City has no mechanism for recruitment in place at the present time.**

Mayor Davlin announced on August 12, 2005 his desire to hire a professional recruiter. [See Ex.3 attached]. Now, almost four months later, the City has not yet hired a professional recruiter, but has in the meantime ceased all functions of the Minority Recruitment Committee. [Ex. 4, pp.47,48] In other words, there is no mechanism in place at the present time for the recruitment of minorities.

City Personnel Director, Larry Selinger testified in a recent deposition, that the Minority Recruitment Committee has not met in the past three months. [Ex.4, pp.47, 48] He did not know who the Chair of that Committee is at the present time. [Ex.4, p.48] In fact, he testified, "I don't know if there is a committee currently". [Ex.4, p.48] Deputy Chief Robert Williams testified that the committee is "in a shambles at the present time. [Ex.5, p.122]

9

**3**

**The City has continued employment practices which unlawfully discriminate against African-Americans in recruitment, hiring and other terms and conditions of employment, in violation of paragraph 9 of the Consent Decree.**

The Consent Decree provides for more than just recruitment and hiring of African-Americans. Paragraph 9 of the Consent Decree orders that the City

> "…shall not engage in any employment practice which unlawfully discriminates against African-Americans, other minorities, or women for recruitment, hiring or other terms or conditions of employment of firefighters and police officers".

This provision brings all current African-American police officers and firefighters, and all minority applicants for those positions, under the umbrella of protection created by the Consent Decree. That umbrella protects all of them from unlawful discrimination.

Thus, it is a violation of the Consent Decree to discriminate against African-American police officers, firefighters, and applicants even if they are not formally parties to this action. They are members of the class of people who are protected by the Consent Decree.

The City argues that Plaintiffs lack standing to assert the rights of persons who are members of this class unless those persons request leave to intervene. Such a requirement would render paragraph 9 of the Consent Decree meaningless and ineffective. The issue here is whether the City violated the terms of the Consent Decree by discriminating against African-American police officers, firefighters and applicants in violation of paragraph 9 of the Consent Decree. There is ample evidence that many such violations have occurred since

the Consent Decree was entered. Such people do not have to be parties to this action in order for the Court to find that the City has violated paragraph 9 of the Consent Decree.

While space does not permit a review here of all the racially discriminatory acts committed by the City since entry of the Consent Decree, since they are numerous, a few examples of such unlawful racial discrimination include the following:

**1. Renatta Frazier**

The most publicized example of racial discrimination in the case of former police officer Renatta Frazier. While that case [Frazier v. Harris, Case No.03-3007) has now been settled as between Frazier and the City, what the City did to her is still a violation of paragraph 9 of the Consent Decree since racially discriminatory acts perpetrated on her by the City occurred after entry of the Consent Decree. In fact, the racial discrimination and harassment of her began almost immediately after the Consent Decree was entered and culminated in her constructive discharge from the police force. This discrimination and harassment included a racially hostile environment which affected the terms and conditions of her employment, unwarranted discipline, false accusations, and failure to correct grossly inaccurate and damaging misinformation about her that had been released to the media. City Alderman Frank McNeil admitted in a recent deposition that what happened to Frazier was racially discriminatory. [Ex.8, p.36]

**2. Rickey B. Davis**

Since the entry of the Consent Decree, Davis, an African-American police officer has been subjected to racially discriminatory treatment in the form of unwarranted discipline, harassment, including being placed under surveillance, retaliation and denial of a promotion to the position of Deputy Chief for which he was qualified.

**3. Ralph Harris**

Since the entry of the Consent Decree, Harris, an African-American police officer (now retired) has been subjected to racially discriminatory treatment in the form of unwarranted discipline, harassment, retaliation and denial of promotions and assignments for which he was qualified.

**4. Lea Joy**

Since the entry of the Consent Decree, Joy, an African-American police officer (now retired) has been subjected to racially discriminatory treatment in the form of unwarranted discipline, harassment, and retaliatory transfer from Internal Affairs.

**5. Chris Wallace**

Since the entry of the Consent Decree, African-American police recruit Chris Wallace was terminated by the City. Deputy Chief Robert Williams, who is in charge of training recruits, testified that the firing of Wallace was racially discriminatory. [Ex.5, p.190] Williams, who was over the police training program, checked with Wallace's training officer the day before the discharge and was advised Wallace was "doing fine". [Ex.5, pp.133] The next day Wallace was fired

at meeting to which Williams was not invited. [Ex.5, p.135] Since that time two African-American police recruits have resigned during training.

### 6. Frank McNeil

Frank McNeil, a member of the Springfield City Council, sent a letter to the United States Department of Justice on August 24, 2005, in which he states, "I believe there are widespread discriminatory practices occurring now and have been for many years". [Ex.6] He further states, " Without your direct involvement and intervention, I do not believe these issues can be resolved". [Ex.6]

## **CONCLUSION**

More than four years ago, the NAACP and the other Plaintiffs entered into an agreement with the City,  which became an Order of this Court, in a good faith effort to improve the representation of minorities in the Springfield Police and Fire Departments. During those four years, the City of Springfield has failed to comply with that agreement and the Court's Order. City Alderman McNeil agreed that, if allowed to take its natural course and without the intervention of the Court, the Springfield Police and Fire Departments will not see hiring and promotion of African-Americans in sufficient numbers. [Ex.8, p.74] Real progress can only be made if the Court requires the City to take the Court's Order seriously and makes it live up to the promises it made four years ago.

WHEREFORE, Plaintiffs, James E. Johnson and Tara Holder, respectfully request the following relief:

A. That the Court conduct a hearing regarding  the issue of whether the City is in compliance with the terms of the Consent Decree;

13

B. That the parties be permitted to engage in discovery prior to such hearing [See, *Thomason v. Russell Corp.,* 132 F.3d 632, 633 (11th Cir. 1998), parties permitted to engage in discovery prior to hearing on motion to enforce consent decree];

C. That the City be required and compelled by the Court to comply with the terms of the Consent Decree;

D. That the Court enter an Order requiring the City to show cause why it should not be held in contempt or otherwise sanctioned for failing to comply with the terms of the Consent Decree;

E. That the Consent Decree be extended beyond the ten (10) year period established by paragraph 23 of the Consent Decree;

F. That the Court award Plaintiffs Johnson and Holder attorney fees and costs incurred in connection herewith;

G. For such other and further relief as the Court deems just and appropriate.

                HART & HART
                Attorneys for Plaintiffs
                Johnson and Holder

                BY:  s/A. COURTNEY COX

A. COURTNEY COX
Illinois Bar #06182590
HART & HART
Attorneys at Law
P. O. Box 937
Benton, IL 62812-0937
Telephone: 618-435-2962
Telefax: 618-435-2962
Email: courtc@harthart.com

**PROOF OF SERVICE**

The undersigned hereby certifies that copy of the foregoing will be sent to the following attorneys through the ECF System on December 5, 2005.

Jenifer Johnson
Corporation Counsel
City of Springfield
Room 100, Municipal Center West
300 South Seventh Street
Springfield, Illinois 62701-1680

Donald M. Craven
Attorney for IAF Local #37
1005 North 7th Street
Springfield, IL 62702

Ronald J. Stone
Attorney for PB&PA Unit #5
725 South 4th St.
Springfield, IL 62703

David L. Rose
Rose & Rose
1320 19th Street, N.W., Suite 601
Washington, D.C. 20036

S/A. COURTNEY COX