**EXHIBIT 1**

1

```
 1            IN THE UNITED STATES FEDERAL DISTRICT COURT

 2               FOR THE CENTRAL DISTRICT OF ILLINOIS

 3
      RICKEY B. DAVIS, et al.,     )
 4                                 )
                Plaintiffs,        )
 5                                 )
                   vs.             ) No.  03-3007
 6                                 )
      JOHN W. HARRIS, et al.,      )
 7                                 )
                Defendants.        )
 8

 9

10

11

12

13            DEPOSITION OF LETITIA DEWITH-ANDERSON

14             TAKEN ON BEHALF OF THE PLAINTIFFS

15                   ON AUGUST 24, 2005

16

17

18

19

20

21

22

23

24    REPORTER:  LINDA HANAGAN, R.P.R., C.S.R. No. 084-002846
```

**HANAGAN REPORTING SERVICE**
**Mt. Vernon, Illinois**
**(618) 244-0216**

```
 1              IN THE UNITED STATES FEDERAL DISTRICT COURT

 2                 FOR THE CENTRAL DISTRICT OF ILLINOIS

 3
     RICKEY B. DAVIS, et al.,    )
 4                               )
              Plaintiffs,        )
 5                               )
                  vs.            ) No.  03-3007:04CV4116
 6                               )
     JOHN W. HARRIS, et al.,     )
 7                               )
                                 )
 8            Defendants.        )

 9

10              IT IS STIPULATED AND AGREED by and

11   between counsel for the Plaintiffs and counsel for the

12   Defendants that the deposition of LETITIA

13   DEWITH-ANDERSON may be taken pursuant to and in

14   accordance with the provisions of the Federal Rules of

15   Civil Procedure; that the deposition is being taken by

16   and on behalf of the plaintiffs on August 24, 2005 at

17   the office of Donald Craven, 1005 North Seventh Street,

18   Springfield, Illinois, before LINDA R. HANAGAN, a

19   Certified Shorthand Reporter and Notary Public in and

20   for the County of Jefferson and State of Illinois; that

21   issuance of notice, or any defect therein, is waived and

22   that this deposition may be taken with the same force

23   and effect as if all statutory requirements had been

24   fully complied with.
```

```
 1                IT IS FURTHER STIPULATED AND AGREED that
 2      all objections to any or all parts of this deposition,
 3      other than to the form of the question, are hereby
 4      reserved and may be raised on the trial of this cause;
 5      that the signature of the deponent is not waived and
 6      that the transcript of this deposition may be used for
 7      any purpose concerning which the reporter could be
 8      called to testify at the time of trial.
 9
10                           APPEARANCES
11
12      For the Plaintiffs. . . . Mr. A. Courtney Cox
                                  Hart & Hart
13                                PO Box 937
                                  Benton, IL 62812
14
        For the Defendants. . . . Mr. James Lang
15                                Asst. Corporation Counsel
                                  800 E. Monroe
16                                Room 313 Mun. Ctr East
                                  Springfield, IL 62701-1689
17

18
        ALSO PRESENT:             Mr. Rickey Davis
19                                Mr. Ralph Harris
                                  Ms. Lea Joy
20

21

22

23

24
```

HANAGAN REPORTING SERVICE
Mt. Vernon, Illinois
(618) 244-021

                                          38

1    about the segregation in the public works garage, did
2    that occur while you were chief of staff?
3         A.   Yes.
4         Q.   Was one of the problems you wanted to
5    address minority recruitment into the police and fire
6    department?
7         A.   Yes.
8         Q.   Did you come up with some sort of package
9    that would address that?
10        A.   I put together -- and this is when I was
11   executive assistant, so I didn't have much say in
12   telling people what to do other than coordinating
13   things.  I put together a minority recruitment with our
14   legal staff, Frank Martinez -- I think that's his last
15   name -- Sandy Robinson, and we talked together with Mark
16   Dymant and some community former fire department and we
17   also met with Don Kliment, the police chief, and we
18   would try to come up with recruiting efforts.  At the
19   time, I looked at the budgets, because I thought first
20   looking at the consent decree for the NAACP case that we
21   needed to make sure there was a line item in the budget
22   of the fire department and police department so we could
23   show we were recruiting.  At the time, the police
24   department did have a recruiting line; the fire

```
 1    department did not.  The recruiter was Mark Dymant who
 2    said to me, "Letitia, I can't get anyplace because we
 3    don't have the money."
 4            Q.  This is for the fire department?
 5            A.  For the fire department.  So when I talked
 6    to the police and to the fire chief, I had said, "The
 7    fire department has to have a line item."  I talked to
 8    the mayor at the time and said, "There's a consent
 9    decree that says we have to recruit, and when you're
10    sending the police department two whites to recruit
11    African-Americans or any other Latino, any other
12    minority group, we're not going to get a good response,
13    and if the line item is so small that they can't go
14    further out or can't bring other people in to do the
15    recruiting for us, it's a moot point."  So at the time,
16    the mayor did agree that at least the fire department
17    needed to have a line item for recruiting and we made
18    sure we put that in the budget.
19            Q.  But they didn't increase the amount?
20            A.  No.
21            Q.  Which is what --
22            A.  The police department did not increase, as I
23    suggested, and the fire department did increase, because
24    it went from zero to something.
```

                                                              40

```
 1           Q.   You also suggested they have African-
 2    Americans or minorities --
 3           A.   People that understand -- that is correct.
 4           Q.   They didn't do that?
 5           A.   No.
 6           Q.   Did you put together something that you gave
 7    to the mayor about the recruiting?
 8           A.   I put together -- I did a summary of the
 9    consent decree.  I put together a summary of what our
10    meetings with the whole recruiting was and what we
11    thought the steps were that we needed to take.  I
12    e-mailed that to the -- I e-mailed it and did a hard
13    copy and put it on his desk.
14           Q.   Do you think he read it?
15           A.   As executive assistant, I don't think the
16    mayor read anything I gave him.
17           Q.   Did he listen to any of your suggestions?
18           A.   Outside of the budget, which I think that
19    actually occurred as chief of staff at the time.
20           Q.   But as executive assistant, he didn't
21    listen?
22           A.   No.
23           Q.   Let's stop at this point and talk about how
24    were the duties and responsibilities and the authority
```

57

1   into a consent decree which became an Order of Judge
2   Mills in a federal case filed by the NAACP.  Did you
3   familiarize yourself with --
4           A.  I read it backwards and forwards.
5           Q.  Did you understand that part of the
6   requirement of that consent decree was that the City
7   file semi-annual reports that had to be detailed and had
8   to be certified?
9           A.  Yes, I did read that and I did discuss that.
10          Q.  Tell me about those discussions.
11          A.  I had, as I said, done a summary of the
12  consent decree outlining the consent decree and had a
13  conversation with the mayor and said he needed to
14  familiarize himself with this and that our corporation
15  counsel, Jennifer Johnson, needs to make sure she looked
16  at this, because I did not think that we were doing
17  everything we were supposed to do.  We were not adhering
18  to the consent decree.
19          Q.  In other words, out of compliance?
20          A.  Yes.
21          Q.  And in what way?
22          A.  Reports, from my understanding, were not
23  being made.  At first I was told they were, but then
24  somewhere down the line that we were not -- there were

58

1    some reports that were not being made.  Then the
2    recruiting.  There were a lot of things in that consent
3    decree that we were not in compliance with.
4           Q.  How was this received when you brought it
5    up?
6           A.  Well, we had a discussion, and the mayor was
7    quite concerned.  He said he hadn't had a chance to look
8    at it.  He would look at it.  I believe he and Jennifer
9    actually did have a conversation which I was not
10   included in.  They brought in Frank Martinez, assistant
11   corporation counsel, to discuss this as well, because I
12   think that was his area.
13          Q.  So to be clear, this is in 2003 that you're
14   telling the mayor and Martinez and Jennifer Johnson and
15   so on that you need to know what's in the consent decree
16   and we need to comply with it including filing reports
17   in a timely manner?
18          A.  That is correct.
19          Q.  The reason I'm asking you that, let me show
20   you this letter, G24, and really there's just one part
21   I'll direct your attention to, paragraph number one, and
22   ask you to read that.  I see here that according to
23   Jennifer -- this is written by Jennifer Johnson, by the
24   way.  It says, "You're correct that the 2004 reports" --

59

1    that would have been two reports -- "and the February
2    2005 report were not provided.  So we see there are at
3    least three reports after you advised them that they
4    needed to comply that they did not file, but the thing I
5    wanted to ask you about is the next part of this.  The
6    next sentence says, "The City regrets this oversight."
7    Now, in view of the fact you had written memos, had
8    discussions, pointed this out, stressed the seriousness
9    of following the Court's decree, do you believe that the
10   failure to file those reports was an oversight?
11          A.  Let me say this.  In all fairness to
12   Jennifer and to the mayor, their characteristics are
13   such that they are -- I'm trying to think of a nice
14   word.  I believe they're not -- they did not take this
15   as seriously as they should or else they thought they
16   knew more than what was actually there and that -- I
17   don't know.  I believe it could have been an oversight.
18          Q.  I guess the reason I'm bringing it up is
19   what I'm seeing based on what you're telling me here
20   about you bringing concerns that are not addressed,
21   people basically not listening to you, we're seeing here
22   now it's an oversight -- that this administration just
23   didn't take the racial issues, including the police
24   department, seriously.

                                                                    65

1          Q.  Let me ask you about this.  You created a
2    committee while you were executive assistant to deal
3    with the consent decree, is that right?
4          A.  That is correct.
5          Q.  Did you do that on your own?
6          A.  Yes, I did.
7          Q.  In other words, the mayor didn't say,
8    "Letitia, I need you to take care of this"?
9          A.  (Witness shakes head from side to side.)
10         Q.  So on your own, you were concerned enough
11   about it, you created your own committee?
12         A.  Yes.
13         Q.  On that committee was Mr. Sandy Robinson?
14         A.  Uh-huh.
15         Q.  He is what?
16         A.  He's the community relations director.
17         Q.  And then also Frank Martinez who's with the
18   corporation counsel's office?
19         A.  That is correct.
20         Q.  He's actually an attorney in this case?
21         A.  Yes.
22         Q.  Now, tell me about that committee.  You were
23   the chair?
24         A.  I don't work as a chair.  We were all just

```
 1    to get this changed, and we were trying to figure out a
 2    way of recruiting African-Americans and starting at a
 3    smaller level of making the police department, the fire
 4    department a friendlier place to African-Americans and
 5    to go in there and create a relationship and have Elmer
 6    go out and talk to them about the fire department.  We
 7    wanted to have someone from the police department to go
 8    in and work with the schools and after school programs.
 9         Q.  During the time you were there, were the
10    efforts of the recruitment committee successful?
11         A.  No.
12         Q.  Do you feel like the administration really
13    took that seriously?
14         A.  No, because the meetings that we had in my
15    office, we actually met with Superintendent Diane
16    Rutledge to try to create some type of program and we
17    gave that to the mayor, and nothing happened with that.
18    The recruiters -- nothing ever happened, so it indicated
19    to me that it wasn't taken seriously.
20         Q.  Don Kliment was chosen by Mayor Davlin to be
21    chief of police -- let me back up and ask that a
22    different way.  Don Kliment was chosen by someone to be
23    the chief of police?
24         A.  That is correct.
```